# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 20, 2013 Session

## STATE OF TENNESSEE v. TERRELL B. JOHNSON

**Appeal from the Criminal Court for Knox County**
**No. 95006   Mary Beth Leibowitz, Judge**

---

**No.  E2012-01946-CCA-R3-CD - Filed December 3, 2013**

---

The Defendant, Terrell B. Johnson, was found guilty by a Knox County Criminal Court jury of possession with the intent to sell one-half gram or more of cocaine in a drug-free zone and possession with the intent to deliver one-half gram or more of cocaine in a drug-free zone, Class B felonies.  *See* T.C.A. § 39-17-417(a)(4), (c)(1) (possession with the intent to sell Schedule II narcotics) (2010).  The convictions were merged, and the Defendant, a Range I, standard offender, was sentenced to twelve years, with a minimum of eight years to be served.  *See id.* § 39-17-432 (2010) (enhanced penalties for offenses committed in drug-free zones).  The sentence was imposed consecutively to the Defendant's sentences in other cases. On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred in denying his motion to dismiss the indictment due to lost and destroyed evidence pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999).  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

A. Philip Lomonaco, Knoxville, Tennessee, for the appellant, Terrell B. Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; and Randall E. Nichols, District Attorney General; Jennifer H. Welch and Sean McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

At the trial, Knoxville Police Department Officer Philip Jinks testified as an expert in drug investigation. He said that on July 19, 2006, he was conducting surveillance of a gas station where multiple drug arrests had occurred and about which complaints of drug traffic had been made. He said that Investigator Maupin and Sergeant Jason Hill were with him and that they were parked in an AutoZone parking lot looking across the street at the gas station. He said a car pulled into the parking lot and parked away from them, facing the store. He said that neither person inside the car came out and that moments later, a second car pulled partially into a space next to the first car and parked at a forty-five degree angle. He said the Defendant, the driver of the second car, walked to the driver's side of the other car. He said the Defendant had a cell phone in his right hand and what appeared to be a plastic bag sticking out of the top of his left fist.

Officer Jinks testified that based upon his experience, he thought he was about to witness a drug transaction. He said that the Defendant leaned inside the driver's window of the other car and that he saw an exchange or hand gestures between the Defendant and the driver. He said he saw their hands meet briefly but could not see what was exchanged. He said the Defendant and the driver spoke briefly. He said the Defendant turned and walked toward the open door of the Defendant's car, at which point he and the other officers got out to approach the Defendant. He stated that he announced they were police officers and that the Defendant began moving more quickly toward the driver's side of his car. He said that he was at the front passenger seat of the Defendant's car, that he told the front passenger he was a police officer, and that the passenger reached under the seat. He thought the passenger might be reaching for a weapon, and he told everyone to show their hands and drew his weapon. He said another passenger was on the backseat of the Defendant's car.

Officer Jinks testified that in his experience, the weight of drugs was always less with laboratory testing than field testing. He said that in the field, drugs were weighed with the packaging but that in a laboratory, they were not. He said that over time, crack cocaine lost water weight from dehydration. He said the field weight of the drugs in this case was 2.5 grams and that the laboratory weight was 1.7 grams. He said that a street-level crack cocaine transaction involved one-tenth to two-tenths gram of cocaine sold for $20 to $60. He said that 1.7 grams would provide about seventeen rocks for an average crack cocaine user. He said that 2.5 grams or 1.7 grams would be a large amount for "street level crack smokers."

Officer Jinks testified that "ping tinging" referred to crushing a small amount of crack cocaine, mixing it with marijuana, and smoking it in a cigarette or cigar. He said the typical amount for ping tinging was one-tenth to three-tenths gram, not 2.5 grams or one-half gram.

Officer Jinks testified that he confiscated a $20 crack cocaine rock from the unidentified driver of the other car and packaged it with the drugs from the Defendant's car. He said that due to budget constraints, misdemeanor amounts of drugs were not tested unless the case went to trial but that felony amounts of drugs were sent to the TBI Laboratory after they were confiscated. He said he thought that the drugs confiscated from the unidentified person had come from the Defendant. He said that the amount of drugs confiscated from the Defendant's car was consistent with possession for resale and that the amount confiscated from the unidentified person was consistent with personal use. He said the rock confiscated from the unidentified person was consistent with a $20 amount and estimated its weight at one-tenth to three-tenths gram. He said he would not have approached the Defendant and drawn his gun if the Defendant had left his car and gone into AutoZone.

On cross-examination, Officer Jinks testified that four-tenths gram of marijuana was confiscated and sent to the TBI Laboratory. He acknowledged this was a small amount. He acknowledged he did not record the unidentified person's name when he combined the crack cocaine confiscated from the person and the Defendant's car. He said he was not the officer who wrote the unidentified person's citation and acknowledged he did not have a copy of the citation. He agreed he and the other officers had been conducting surveillance for about four hours before the Defendant arrived and said they had been watching activity across the street but had not made any arrests. He said he noticed the car that arrived first because no one got out and it had a Sevier County license plate. He agreed that three young, black males were in the Defendant's car and that the driver of the other car was black. He agreed that crack cocaine was very addictive, that users might purchase a $20 rock and then purchase another $20 rock an hour later, and that they might use eight to ten $20 rocks a day. He agreed three people who smoked crack cocaine with cigarettes for an evening might use 1.7 or 2.5 grams but said the crack cocaine that was confiscated was a large rock and a couple of smaller rocks. He agreed the quantity of drugs was not so much that three people could not have consumed it in one night. He said, though, it was unusual for crack cocaine users to plan ahead and purchase the quantity they might use for an evening. He said that although he saw the Defendant involved in the transaction, he went to the passenger side of the Defendant's car because he was closer and another officer went to the driver's side. He agreed that nothing was under the passenger seat.

Officer Jinks agreed he needed reasonable suspicion to stop the Defendant and said it was provided by his seeing the Defendant's hand-to-hand transaction. He said that it was typical for drug dealers to keep drugs in plastic bags but that people who bought one or two rocks typically did not carry it in plastic bags. He did not know the weight of a plastic sandwich bag. He said that an "eight ball" was one-eighth of one ounce. He said that this was about three and one-half grams but that an eight ball "on the street" typically weighed 2 to 2.5 grams. He said that typically, an eight ball was purchased by a street-level dealer to

be sold in $20 amounts. He said it was not typical for users to buy an eight ball but agreed it was possible for a user to consume several grams in twenty-four hours. He said the amount found in the Defendant's car was "a little less" than an eight ball. He thought Investigator Maupin recovered the drugs from the unidentified person and gave them to Sergeant Hill. He did not know who put the drugs in the bag with the drugs from the Defendant's car. He acknowledged that it was important to preserve evidence as it was found and said he would not package drugs from two sources together. He did not know whether the bag was weighed before or after the rock from the unidentified person was added. He acknowledged that he did not know if the laboratory tested all the bag's contents or only a portion. He did not know why the citation for the unidentified person could not be found.

Officer Jinks testified that when the front passenger left the Defendant's car, a half-smoked marijuana cigarette fell from his lap. He agreed that he wanted everyone out of the car but denied the officers focused on the car's occupants because it was a "slow night." He said the backseat occupant of the Defendant's car was not arrested because he did not have any drugs. He agreed the cigarette was tested and contained marijuana. He said he did not request that it be tested to determine if it contained cocaine.

On redirect examination, Officer Jinks testified that since the date of the Defendant's arrest, he had learned he could request limited testing of substances in misdemeanor cases. He said the small quantity of marijuana was tested because it was sent to the laboratory with the other drugs. He said that he had reasonable suspicion when he saw what he thought was a drug transaction and that he had probable cause when he saw the drugs.

On recross-examination, Officer Jinks acknowledged that he did not have the Sevier County license plate number of the unidentified person's car, the person's name, or the citation the person received. He said that at the time, he was told he could not send a single rock to the laboratory if it was a misdemeanor quantity. He acknowledged that the marijuana belonging to the Defendant's front seat passenger was a misdemeanor quantity but said it was associated with the felony quantity of crack cocaine the Defendant had. On further redirect examination, he identified the TBI Laboratory report, which stated that the crack cocaine weighed 1.7 grams.

Knoxville Police Sergeant Jason Hill testified that in his employment, he had seen drugs hundreds of times, including drugs for personal use and drugs for resale. Regarding July 19, 2006, he said that he had been conducting surveillance of a Chevron gas station, an AutoZone store, and alleys with Officer Jinks and Investigator Maupin for about four hours. He said they were parked in the AutoZone parking lot. He said that around 8:00 p.m., Officer Jinks directed his attention to a car with a Sevier County license plate that pulled into the AutoZone parking lot. He said a beige Chevrolet pulled in later. He said their focus

shifted to the cars. He said that Officer Jinks was on the backseat of their van, that he was in the driver's seat, and that he saw the Defendant walk to the other car and have a "handshake type of action." He stated that he could not see it himself but that Officer Jinks said he saw a cell phone in one of the Defendant's hands and a plastic bag in the other. He said the Defendant walked back to the driver's side of the beige Chevrolet and did not go to AutoZone's door. He said the cars were "pretty much across the parking lot" from each other. He stated that he went to the Sevier County car and that the other officers went to the beige Chevrolet. He said that after he heard Officer Jinks tell someone to put up the person's hands and saw Officer Jinks draw his weapon, he went to the beige Chevrolet because he thought danger existed. He said he drew his weapon and went to the driver's side of the Chevrolet where the Defendant was on the ground. He said Investigator Maupin was nearby. He said he stepped toward the driver's door of the Defendant's car and saw a bag of eight to ten rocks of an off-white substance that appeared to be crack cocaine in a "dug out" part of the door near the handle. He said the packaging was consistent with the typical packaging of crack cocaine. He did not recall if the Defendant made a statement that night. After his recollection was refreshed with his affidavit, he said the Defendant said he "does that to get by," referring to the bag containing the rocks.

Sergeant Hill testified that typically, the police would not make arrests for open-air drug sales when they were conducting surveillance. He said they tried to develop an informant by following a person and conducting a traffic stop. He said that they confiscated crack cocaine from the person in the Sevier County car and that the cocaine was packaged in the Defendant's bag. He said packaging the drugs together was an error that would no longer happen. He said the rocks from both sources appeared to be of consistent color. He said the gross weight of the bag and the drugs was 2.5 grams. He described the bag's contents as one large and several smaller rocks. He said the person in the Sevier County car had one of the smaller rocks. He said that based upon his training and experience, it was his opinion that the large rock weighed more than one-half gram. The bag of crack cocaine was received as an exhibit. He said one of the other officers confiscated a marijuana cigarette, which "was being stuffed" under the passenger-side seat. He agreed the Defendant did not have the marijuana.

On cross-examination, Sergeant Hill testified that he did not see anything in the Defendant's hands. He acknowledged it could be difficult to carry the confiscated bag with an inch or two of plastic sticking out of a person's hand. He drew a diagram of the scene, which was received as an exhibit. Sergeant Hill said that he was at the Sevier County car for twenty to thirty seconds and had the driver put his hands on the steering wheel but that his attention went to the Defendant's car when he heard Officer Jinks yelling. He took the keys from the Sevier County car and went to the Defendant's car. He disagreed that his prior testimony reflected that he went straight to the Defendant's car and said counsel redirected

his testimony when he began explaining. He said the officers had been in various locations around the Chevron station since 4:00 p.m. He agreed he had testified incorrectly at a prior hearing when he said the officers were backed into a parking place and that the Sevier County car and the Defendant's car pulled in one immediately after the other. He acknowledged that at a previous hearing, he testified that the Defendant arrived before the people in the other car. He acknowledged he did not get the Sevier County car's driver's name or license plate number. He thought Investigator Maupin collected the drugs. He said he probably put the drugs in the plastic bag because he was the person who "bagged" the evidence. He acknowledged he did not have a copy of a citation given to the Sevier County car's driver, although citations had a carbon copy for an officer.

Sergeant Hill testified that a rock of crack cocaine could be as large as the vessel in which it was cooked. He said that the amount of baking soda used to make crack cocaine and the concentration of cocaine might vary and that the purity level of the drugs in this case was not tested. He said smoking in a crack pipe or marijuana cigarette was the most common method of ingesting crack cocaine. He said a $20 rock typically weighed about two-tenths gram and agreed a crack user could use one gram or more per day. He said that according to drug-addicted people he had interviewed, the effect of smoking a rock of crack cocaine lasted thirty minutes to one hour, after which they sought more drugs. Regarding a cigar received as an exhibit, he agreed it had a flat portion. He said that although he had spoken with Officer Jinks, they did not talk about Officer Jinks's testimony. He acknowledged that his testimony at the suppression hearing was that when he and the other officers decided to approach the Defendant's car, he approached the Defendant and that the other officers went to the Sevier County car. He conceded that his trial testimony was different.

On redirect examination, Sergeant Hill testified that he was confused about which car arrived first, which car he approached first, and which way the officers' van was pointed because he had been in the AutoZone parking lot and other parking lots many times. He agreed that he had never testified that no crack cocaine was in the Defendant's car door or that the amount of the drugs was not an amount that would be possessed for resale. He said he had never testified that anyone other than the Defendant claimed ownership of the crack cocaine in the Defendant's car door. He identified an aerial photograph depicting AutoZone and Chilhowee Park.

Knoxville Police Investigator Jeremy Maupin testified that he was a narcotics investigator and member of the Drug Enforcement Agency (DEA) Task Force. He said he had seen crack cocaine thousands of times. He said he and other officers were doing surveillance of a Chevron station about which there had been numerous complaints of drug activity. He said that he did not have a good view but that Officer Jinks narrated what he saw. He said that after Officer Jinks gave them a "green light," they went to the Defendant's

car and the Sevier County car. He said he went toward the driver's side of the Defendant's car but heard Officer Jinks yelling at the passenger. He said that he thought there was a gun in the car based on how the passenger acted and that he went to help Officer Jinks remove and handcuff the passenger. He said that although he did not see it immediately, he eventually saw a bag of an off-white rock-like substance in the "door handle part of the driver's door."

Investigator Maupin testified that he went to the Sevier County car. He said that a person in the car voluntarily produced a rock of crack cocaine and that it probably had a value of $20. He did not recall the person's name but said the person was cited for misdemeanor drug possession. He said he attempted to locate the person's name but was unable to find it in the police's system. He said that everyone from both cars was detained because they did not know what had been shoved under the seat.

Investigator Maupin testified that in his experience, people addicted to crack cocaine typically bought $20 to $50 amounts, used the drugs immediately, and sought more money to buy additional drugs. He said that drug dealers typically kept their supply in a large rock because they did not know the amount their next customer might want.

On cross-examination, Investigator Maupin testified that he did not recall the amount of money the Defendant possessed. He agreed that police procedure was to seize the money and record the amount. He did not recall seizing the Defendant's car. He did not recall if he wrote the citation for the person in the Sevier County car. He acknowledged the police had not found a carbon copy of the citation. He did not remember getting the license of the driver of the Sevier County car. He did not remember if he bagged the crack cocaine and said the bag was given to Sergeant Hill. He agreed the amount the Defendant possessed was less than an eight ball. He said that when an eight ball was purchased, it was usually purchased by three or four people.

TBI Laboratory Forensic Scientist Supervisor Celeste White, an expert in forensic chemistry, testified that she tested the evidence collected in this case. Without the packaging, the white substance weighed 1.7 grams and tested positive for cocaine base. She said the laboratory did not test the substance for its purity. The plant material tested positive for marijuana.

On cross-examination, Ms. White testified that without the large rock of crack cocaine, the remaining amount was about two-tenths gram. She described the crack cocaine as a large rock, two small rocks, and some chips. Regarding the marijuana, she did not separate it from the cigar. She said that the cigar did not appear to have much marijuana inside and that cigars containing marijuana were sometimes rolled loosely, allowing the

-7-

marijuana to fall out. On redirect examination, she said she did not see any crack cocaine with the marijuana.

Knox County Director of Public Assembly Facilities Bob Polk testified that he managed Chilhowee Park, a Knox County public park. He identified the park on a map. On cross-examination, Mr. Polk identified the entrance to a day care facility on the map.

Trevor McMurray, an analyst with Knoxville's Geographic Information System, testified that he prepared a map for use in this case, which he identified. He said the map depicted a 1000' buffer around 3100 East Magnolia Avenue, the address identified by other evidence as AutoZone. He said the address was 907.4' from Chilhowee Park. He said the measurement was accurate within 1'. On cross-examination, he said the measurement was from the edge of the parcel at 3100 East Magnolia Avenue, not the center of the parking lot or a particular parking space. On redirect examination, he agreed the distance between 3100 East Magnolia Avenue and Chilhowee Park was two city blocks.

Azikewe Awolowo, the Defendant's cousin, testified for the defense that he was with the Defendant on July 19, 2006, when they were stopped by the police. He said he was fourteen years old at the time. He said the Defendant was taking him home when they stopped at an auto parts store due to mechanical problems with the Defendant's car. He said he had a basketball tournament. He said that as the Defendant got out of the car, a van "arrived on the set . . . pulled out their guns and told us to freeze." He said he did not see the Defendant get out of the car and sell drugs.

On cross-examination, Mr. Awolowo testified that he thought the Defendant was going to go into the store for water or a car part, although he said he was unsure due to the passage of time. He was unsure but thought they had been at his uncle's house earlier. He did not recall if the van pulled in as the Defendant was getting out of the car or if it was already there, but he remembered four or five armed men getting out of it. He said they told them to put up their hands or the men would shoot. He said that he was on the backseat and that Dwight Schooler was on the front seat. He denied that the Defendant got out of the car previously and said he and Mr. Schooler did nothing other than sit in the car. He did not see Mr. Schooler reach under the front seat but heard someone say that if Mr. Schooler did not keep his hands raised, the men would shoot. He denied that he used drugs that day, that they planned to smoke marijuana and crack cocaine later, and that he had ever smoked marijuana laced with crack cocaine. He said that he knew the Defendant smoked marijuana laced with crack cocaine previously but that he did not see or know marijuana or crack cocaine was in the car that day. He denied that the drugs were his. He stated that an officer said he would shoot them in the head but could not identify the officer. He said smoke was coming from the engine as they pulled into the parking lot.

The jury found the Defendant guilty of possession with the intent to sell more than one-half gram of cocaine within 1000' of a public park and possession with intent to deliver more than one-half gram of cocaine within 1000' of a public park, and the trial court merged the convictions. This appeal followed.

## I

The Defendant contends that the evidence is insufficient to support his conviction. The State counters that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4). The Drug Free School Zone Act states that when an offense involving a controlled substance, in violation of T.C.A. § 39-17-417,

> occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

*Id.* § 39-17-432.

The Defendant argues that the State presented evidence that the edge of the AutoZone property was 907.4' from Chilhowee Park but not that he was within 1000' of Chilhowee Park. Although he does not contest that he possessed cocaine, he contends it was for his personal use. He argues that because the police combined the drugs they confiscated from his car and the driver of the Sevier County car, the evidence does not establish that he

possessed a sufficient amount to be guilty of possession with the intent to sell. He also argues that the Drug Free School Zone Act should not apply because the "application of the statute was inconsistent with the stated purpose of the act." He argues that Chilhowee Park does not have a playground and was closing around the time of the cocaine transaction.

In the light most favorable to the State, the evidence reflects that the Defendant possessed 1.7 grams of cocaine. Although he contests the sufficiency of the proof of the weight of the cocaine, the evidence reflects that even without the small rock confiscated from the driver of the Sevier County car, the Defendant's cocaine weighed one-half gram or more. The weight and the large rock in the bag confiscated from the Defendant's car were consistent with the amount and form of cocaine possessed by a drug dealer, rather than a drug user. Although the Defendant was not charged with selling cocaine, the proof of his transaction with the unidentified person is evidence that he possessed the cocaine in his car for sale or delivery.

Regarding the question whether the drug transaction took place within a Drug Free School Zone, the Defendant argues that the State established the distance from the boundary of the park to the boundary of the AutoZone property, not the distance from the place the transaction took place to the boundary of the park. The State presented proof that the boundary of the AutoZone property was 907.4' from the boundary of Chilhowee Park. The trial court received as an exhibit an aerial photograph showing the 1000' periphery from the edge of the AutoZone property, which extended beyond the border of the park into the park. The court also received as an exhibit a diagram of the AutoZone parking lot showing the locations of the Defendant's car and the Sevier County car. In the hand-drawn diagram, the Seiver County car is shown in a parking place in front of the front corner of AutoZone furthest from Chilhowee Park. The Defendant's car was parked at an angle in front of the next two parking places closer to Chilhowee Park, near the center of the storefront. The aerial map depicted the AutoZone building and the parking places in front of it. Cars were visible in the parking places, which assists the viewer in determining the location of the spaces.

The jury also heard evidence of the Defendant's location within the parking lot. Although the 907.4' measurement is from the edge of the AutoZone parking lot to the Chilhowee Park border, the map depicts the full extent of the 1000' boundary, and the map contains a scale that can be used to determine the distance beyond the edge of the 907.4' measurement to the location where the Defendant possessed the drugs. From the evidence, a rational jury could conclude beyond a reasonable doubt that the Defendant possessed drugs with the intent to sell or deliver them when he was within 1000' of Chilhowee Park.

Regarding the Defendant's argument that the Drug Free School Zone Act should not apply, we note that the Act's plain language contains no limitation on its applicability to opening hours of the facilities listed or the presence of a playground that might draw children. *See id.* § 39-17-432; *State v. Smith*, 48 S.W.3d 159, 169 (Tenn. Crim. App. 2000) ("The language of the Act unambiguously imposes enhanced criminal penalties for drug offenses occurring inside the school zone regardless of the timing of the drug offense."). We note, as well, that the Defendant argues facts–the hours the park is open and whether it has a playground–that were not received as evidence at the trial or the motion for a new trial. Because the evidence is sufficient to support the conviction and the Defendant has not established that the Drug Free School Zone Act did not apply, he is not entitled to relief.

## II

The Defendant contends that the trial court erred in denying the motion to dismiss the indictment pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), because the State was unable to provide the citation given to driver of the Sevier County car in order to identify the person and the rock of crack cocaine seized from the person. The State responds that the trial court did not abuse its discretion in denying the motion to dismiss the indictment. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution affords every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). Accordingly, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Our supreme court has said, "[T]he evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *State v. Angela M. Merriman*, --- S.W.3d ---, slip op. at 5 (Tenn. Aug. 16, 2013) (citing *Ferguson*, 2 S.W.3d at 915-16).

In the jurisprudence that preceded *Merriman*, the question of the extent of the State's duty to preserve evidence was addressed with varying results. *Merriman*'s touchstone was *Ferguson*. In *Ferguson*, our supreme court looked to *Arizona v. Youngblood*, 488 U.S. 51 (1988), as the "leading federal case regarding the loss or destruction of evidence." *Ferguson*, 2 S.W.3d at 915. Both *Ferguson* and *Youngblood* dealt with the loss or destruction of *potentially* exculpatory evidence, not evidence that had an exculpatory value that was apparent at the time it was lost or destroyed. The Court in *Youngblood* concluded that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488

-11-

U.S. at 58. In *Ferguson*, our supreme court rejected the bad faith requirement and the *Youngblood* analysis in its pure form because "proving bad faith on the part of the police would be, in the least, extremely difficult," and "the *Youngblood* analysis apparently permits no consideration of the materiality of the missing evidence or its effect on the defendant's case." *Ferguson*, 2 S.W.3d at 916. Instead, the court adopted a balancing approach and stated that the critical inquiry in determining the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory is whether "a trial, conducted without the destroyed evidence, would be fundamentally fair[.]" *Id.* at 914.

The *Ferguson* court noted that the difficulty in determining the extent of the duty to preserve evidence was recognized in *California v. Trombetta*, 467 U.S. 479 (1984). In *Trombetta*, the United States Supreme Court said that the State's duty extended only to "evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488. *Trombetta* said that in order for evidence to meet a constitutional materiality standard, it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488-89. Notwithstanding its consideration of *Trombetta*, the *Ferguson* court did not adopt its standard for constitutional materiality. *Ferguson*, 2 S.W.3d at 918. Rather, *Ferguson* imposed the duty on the State to preserve "potentially exculpatory evidence." Noting that the evidence in question "was probably of marginal exculpatory value," the court nevertheless said "it was at least 'material to the preparation of the defendant's defense' and might have led the jury to entertain a reasonable doubt about [the defendant's] guilt." *Id.* The court said that the State breached its duty to preserve the evidence and conducted the balancing analysis using the three factors we have noted above. *See id.* at 917.

Following *Ferguson*, this court looked on occasion to the *Trombetta* standard in determining if the State had a duty to preserve evidence which the accused contended was exculpatory, despite noting that the court in *Ferguson* only "seemingly cited with approval" the standard for constitutional materiality stated in *Trombetta*. *See State v. Coulter*, 67 S.W.3d 3, 54-55 (Tenn. Crim. App. 2001) (determining that the State had no duty to preserve the missing evidence because drawing a conclusion that it had any exculpatory value would be "an exercise in pure speculation"); *see also State v. Ronnie D. Sims*, No. M2004-02491-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App. Nov. 22, 2005) ("The mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under *Ferguson*."), *perm. app. denied* (Tenn. Mar. 30, 2006). In other cases, however, this court has said that the State had a duty to preserve evidence without finding that the evidence had apparent exculpatory value. *See State v. Jeremy Keeton*, No. M2009-01928-CCA-R3-CD (Tenn. Crim. App. June 26, 2012) (citing other unpublished decisions that considered the State's duty to preserve evidence without determining that the

evidence had apparent exculpatory value); *See State v. Lonnie T. Lawrence and Patrick D. Pickett*, No. E2007-00114-CCA-R9-CD, slip op. at 13 (Tenn. Crim. App. Mar. 17, 2008) (holding that although items seized from a methamphetamine laboratory may or may not have revealed fingerprints, the State had a duty to preserve the evidence that was not tainted or dangerous to collect and preserve because the evidence was "at least, material to the preparation of their defense"); *State v. Sheri Lynn Cox*, No. E2005-00240-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App. Dec. 12, 2005) ("While the exact nature of the evidence, whether exculpatory or inculpatory, is unclear, the receipt books were, at the very least, material to the preparation of the appellee's defense. . . . Therefore, the State had the duty to preserve the evidence."); *State v. Thomas W. Cothran*, No. M2005-00559-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App. Nov. 29, 2005) (holding that the State had a duty to preserve a beer carton and beer cans found at the scene of a traffic accident involving an intoxicated driver, despite stating that the defendant failed to address adequately how the evidence would have been exculpatory), *perm. app. denied* (Tenn. May 1, 2006); *see also State v. Benjamin Hernandez, III*, No. M2000-00225-CCA-R3-CD, slip op. at 7-9 (Tenn. Crim. App. Nov. 21, 2001) (stating that the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Criminal Procedure Rule 16 and citing *Ferguson* but omitting any reference to *Trombetta* or a need for the evidence to have an apparent exculpatory value before a duty to preserve the evidence arises).

The unpublished decisions notwithstanding, this court was, until the *Merriman* decision, bound by *Coulter*, a published case. *See Coulter*, 67 S.W.3d at 54-55. *Coulter* relied on *Ferguson* to conclude that in providing the Defendant with a constitutionally fundamentally fair trial, the State had no duty to preserve evidence that lacked apparent exculpatory value before the evidence was destroyed and for which no comparable evidence could be obtained by a defendant through reasonably available means. *Id.* at 54 (citing *Ferguson*, 2 S.W.3d at 917). Though *Merriman* did not explicitly address this court's *Coulter* decision, *Merriman* rejects the principle for which *Coulter* stands. As we have stated, *Merriman* provides that the State has a duty to preserve evidence with potential exculpatory value and for which comparable evidence is not available through reasonably available means. *Angela M. Merriman*, --- S.W.3d at ---, slip op. at 14. We conclude that this court's opinion in *Coulter* is no longer good law on this point, and we will consider the extent of the State's duty to preserve evidence in accord with *Merriman*.

Turning to the present case, we begin with determining whether the State had a duty to preserve the evidence. *Id.*, --- S.W.3d at ---, slip op. at 14; *Ferguson*, 2 S.W.3d at 917. If the State had a duty to preserve the evidence and failed in that duty, the court should consider the following factors in determining the consequences of that error: (1) the degree of negligence involved, (2) the significance of the lost or destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains

available, and (3) the sufficiency of the other evidence used at the trial to support the conviction. *Ferguson*, 2 S.W.3d at 917. If the trial court determines that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges or craft such orders as may be appropriate to protect the defendant's right to a fair trial. *Id.* Review of a trial court's ruling on the fundamental fairness of a trial without the missing evidence is de novo. *Angela M. Merriman*, --- S.W.3d at ---, slip op. at 18. Review of the appropriateness of the remedy provided by the trial court is for abuse of discretion. *Id.*

### A. Duty to Preserve the Citation Containing the Identity of the Unknown Person

We note that the Defendant was charged with possession with the intent to sell and possession with the intent to deliver cocaine. He admitted that the drugs found in his car were his, but he contested that he sold drugs to the unidentified person. The identity of the person cited was material to the defense because the person allegedly was involved in a drug transaction with the Defendant and the Defendant's engaging in a sale was relevant to show his intent to sell or deliver drugs. *See State v. Steven O. Hughes-Mabry*, No. E2011-02255-CCA-R3-CD, slip op. at 23 (Tenn. Crim. App. May 16, 2013) (concluding that the State had a duty to preserve the identity of a participant in an attempted drug transaction with the defendant and noting that the evidence obtained during a search of the person was used against the defendant at the trial), *perm. app. denied* (Tenn. Oct. 16, 2013). Given that the Defendant's proof was that he never approached the Sevier County car, we conclude that the Defendant had no way of identifying the person other than through the citation. The Defendant was unable to obtain comparable evidence through other reasonably available means.

### B. Duty to Preserve the Drugs from the Unidentified Person

Regarding the Defendant's allegation that the State failed to preserve the drugs confiscated from the unidentified person, we note that although there technically was no failure to preserve the drugs, the drugs were not individually preserved in a manner that separately identified them and would permit testing of the quantity and content of the individual rock from the unknown person. Had the rock from the unidentified person been separately preserved and determined upon testing not to be crack cocaine, this evidence would have supported the defense that the Defendant's drugs were for personal use, not sale or delivery. We note that there was no comparable evidence from another source.

## C. **Analysis of the *Ferguson* Factors**

We conclude that because the evidence possibly might have helped show that the Defendant possessed the drugs for personal use, not sale and delivery, the State had a duty to preserve the evidence. Regarding the remaining *Ferguson* factors, negligence is presumed from lost evidence. *Ferguson*, 2 S.W.3d at 917 n.10. The record does not indicate otherwise. Considering the significance of the evidence, we again note that had the evidence been preserved, it might have shown that the Defendant possessed crack cocaine for his personal use. We acknowledge, though, that the Defendant had a large quantity of crack cocaine in addition to the amount he allegedly sold to the unidentified person and the evidence that most of the cocaine was a single large rock and was packaged consistently with how drug dealers kept drugs. We conclude that the missing evidence had some significance. Finally, considering the sufficiency of the remaining evidence, we conclude that the evidence of the Defendant's guilt was strong. We also note that the Defendant offered proof from one of his passengers that the Defendant did not approach the Sevier County car, but the jury rejected this evidence. Upon balance, we conclude that the evidence implicated the Defendant's right to a fundamentally fair trial.

The question becomes one of the proper remedy to preserve the Defendant's right to a fundamentally fair trial. In that regard, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to dismiss the indictment. To the extent that the unknown person's rock might have been available, if preserved separately, to show that it was a substance other than crack cocaine, we note that a portion of the drugs in the package containing both the Defendant's drugs and the unknown person's rock was tested and determined to be cocaine. In view of the Defendant's other evidence that he possessed the cocaine for personal use and the testimony of the officers about the Defendant's actions and the quantity, form, and packaging of the drugs found in the Defendant's car, dismissal was not required in order to protect the Defendant's right to a fundamentally fair trial.

The Defendant argues briefly that the trial court should have, at a minimum, given a jury instruction regarding the State's failure to preserve the evidence. As the court noted in *Merriman*, Tennessee Pattern Jury Instructions–Criminal section 42.23 provides the following instruction:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

If, after considering all the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

*See Angela M. Merriman*, --- S.W.3d ---, slip op. at 18 n.12, *Ferguson*, 2 S.W.3d 917 n.11.

Although we have concluded that fundamental fairness does not mandate a dismissal, we believe that the absent evidence instruction was an appropriate intermediate remedy to ensure the Defendant received a fair trial despite the State's failure to preserve the citation, the identity of the driver of the Sevier County car, and the rock confiscated from the unknown person. We conclude, though, that the lack of a *Ferguson* instruction was harmless in view of the strength of the State's case. We note that in addition to the proof of the amount, form, and packaging of the drugs the Defendant possessed, the State offered eyewitness testimony from Officer Jinks that he saw the Defendant approach and speak to the driver of the Sevier County car and engage in an exchange or hand gestures that appeared to be a drug transaction. *See* T.R.A.P. 36(b).

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE